Filed 12/18/14  P. v. Smith CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H039934 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1089639) |
| v. | |
| JOSEPH JERMAINE SMITH, | |
| Defendant and Appellant. | |

Following a jury trial, Joseph Jermaine Smith was convicted of a lewd and lascivious act upon a child under 14 years of age (Pen. Code, § 288, subd. (a)) (count two).[1]  The jury hung on a second charge of oral copulation (count one) and the trial court declared a mistrial on that charge.  The trial court found the three prior prison term allegations to be true (§ 667.5, subd. (b)).  The court sentenced him to a total prison term of nine years.

On appeal, defendant challenges the exclusion of certain evidence and contends that the prosecutor committed misconduct during closing argument.  We find no reversible error and affirm.

---

[1]     All further statutory references are to the Penal Code unless otherwise specified.

# I

## *Guilt Phase Evidence*

A.  *Prosecution's Case*

A.B. testified that she was the mother of a daughter, A., and a son, J., (hereinafter "mother").  She had been in a relationship with defendant that ended in about November or December 2008.  Mother had sporadic contact with defendant from that time until 2010.

Around October 2010, mother was living in an apartment with A., then five years old, and J., then about 16 months old.  Defendant moved in with mother and, on October 7, 2010, defendant had been living there for a week or two.  In her home, defendant was called Jermaine.

On October 7, 2010, mother left A. home alone with defendant when she took J. to urgent care.  At that point, she did not have alternative child care.

At trial, A., who was then almost eight years old, confirmed that defendant touched a "private place" on her body when she was five years old.  She remembered telling a police officer that defendant licked her "private area" and stated that was the truth.  She was wearing a tank top and shorts and defendant moved her clothes.  At trial, A. could not remember if defendant touched her body in any other way.  She recalled being in her "mom's room" when defendant touched her "private part."  She was lying down and watching television.

A. testified that she did not know anybody named Jacob.  She did not remember telling defendant that a man named Jacob used to hide in her closet.

At trial, A. did not remember telling defendant that he was not J.'s father.  A. did not remember having a conversation, a couple of days before defendant touched her "private part," with mother and a woman named Barbara about A. lying to defendant.

At about 4:00 p.m. on October 11, 2010, San Jose police officers took an initial report.  The interview with A. was recorded.  The recording was played for the jury.  at

2

At the beginning of the recording, Officer Kopp states that he is at the Chevron station at the corner of Lincoln and Curtner and speaking with A.

A. said that defendant woke up, she got on top of him, he awoke again, and he went to the bathroom. A. said that he kissed her on the lips for one minute but he did not use his tongue. They were in the bedroom on the bed. A. said he did not kiss her anywhere else. A. told Officer Kopp that defendant touched her "private stuff." The officer asked A. to show him where defendant touched her, which she impliedly did as indicated by her response, "Uh-huh, right here." A. confirmed she was wearing pants. Officer Kopp inquired, "Okay. Did he reach underneath your pants?" A. answered no. The officer then asked, "Just above 'em?" and A. replied, "Just above 'em." A. said that she "told him to stop one time, but, he didn't." When Officer Kopp asked whether defendant kissed A.'s private part., A. answered no. She said defendant had kissed her one time and touched her "private part" one time.

On October 12, 2010, Christopher Scott, who was a detective in the San Jose Police Department's Sexual Assault Investigation Unit, was assigned to investigate the case involving A. and defendant. Detective Scott interviewed A. on October 13, 2010 at the child interview center. The interview was recorded and the recording was played for the jury.

During the October 13, 2010 interview, A. told Detective Scott that defendant put his tongue in her mouth. Defendant also put his tongue in her "private area." It happened one time. They were in her mother's room. These things happened about three days earlier and the person who did it was her brother's dad, Jermaine. He had taken off his pants but he still had his shorts on. A. was wearing shorts and underwear but he moved them to the side. A. disclosed that defendant asked her to do the "thing he did to [her]," which was "put his tongue in [her] private stuff," but she did not want to. She thought he smelled and "it would be nasty."

3

Officer Scott had A. circle her "private part" on a diagram of an unclothed female child. A. confirmed that was where defendant put his tongue. She also circled a second place where defendant had put his tongue. A. circled the girl's vagina area and mouth. A. never saw defendant's private part. Defendant had not previously touched her private part. She indicated that no one else had ever touched her private part before defendant did.

On later dates, Detective Scott collected A.'s shorts and two buccal swabs from A.'s inner cheek. The detective also obtained two vials of defendant's blood as a reference sample. He transported those items to the Santa Clara County Crime Laboratory.

The transcript of A.'s testimony at the preliminary hearing, which commenced on April 19, 2011, was read to the jury. A. testified that, while she and the defendant were home, defendant touched the skin of her "privates area" on the front, bottom of her body with his tongue. She was wearing clothes but defendant moved them. She was in her "mom's room." A. testified that defendant's tongue did not touch her mouth. At the preliminary hearing, A. indicated that she did not know whether defendant was J.'s father.

During the preliminary hearing, A. remembered that, while defendant was babysitting her on the day mother brought her brother to the doctor, defendant fell asleep on the couch. The prosecutor asked, "Did you ever climb on [defendant] while he was on the couch?" A. answered, "I don't know." When she was asked, "Did [defendant] ever put his hand on any part of your body while he was babysitting you," A. said, "I don't know." The prosecutor asked, "Did [defendant] ever put his tongue on any part of your body while he was babysitting?" A. confirmed that defendant put his tongue on her "private area" and also testified that he touched her "private area" with his tongue. She did not know where she was in the apartment when that occurred. She was wearing clothes at the time.

4

During the preliminary hearing, A. indicated that she had a baby cousin named Jacob. She did not know a grownup named Jacob.

Miriam Wolf testified as an expert regarding child sexual abuse accommodation syndrome (CSAAS). She explained the five categories of the syndrome: (1) secrecy, (2) helplessness, (3) entrapment and accommodation, (4) delayed, conflicted and unconvincing disclosure, and (5) retraction. She explained that the information enables researchers and practitioners to understand common patterns of behavior of children who are sexually abused but not to decide whether child sexual abuse has occurred in a particular case.

Michelle Ebert, a criminologist in the Santa Clara County Crime Laboratory's DNA unit, testified as an expert. Detective Scott provided her with the victim's shorts and two buccal swabs taken from the victim and defendant's samples. She tested three cuttings from the shorts. They were negative for seminal fluid or semen. She also tested the cuttings for amylase, a component of saliva, and performed DNA analysis on them. On sample 1A-1, the cutting from the right inner thigh of the shorts, defendant was "the source of the major DNA profile present" on the cutting but the result of the amylase testing was inconclusive. The result of the amylase testing on sample 1A-2 (middle crotch area) was inconclusive and the result of the amylase testing on sample 1A-3 (inner left thigh) was negative. The results of the DNA analysis on sample 1A-2 was inclusive, meaning defendant could not be excluded or included. The DNA analysis on sample 1A-3 indicated that defendant was "included as a possible contributor to the mixture."

B. *Defense Case*

The defense called mother to testify. Mother's relationship with defendant initially began in about September 2008 and lasted about two or three months. While defendant was staying with mother in her two-bedroom apartment in October 2010, mother wanted things to work out with defendant because she wanted to have a family and she wanted him to be there for J. At the time, mother was not working.

5

During the time defendant briefly lived with mother in October 2010, mother suspected that defendant was cheating on her. Mother and defendant argued about it. They also argued because mother did not want defendant to see his son by himself.

According to mother, prior to the allegations of inappropriate touching, A. had repeatedly expressed to her that A. did not like defendant. Mother indicated that defendant had scared A. when the three of them had lived together while mother was pregnant with J. Defendant was J.'s father but not A.'s father. During the time defendant had lived with mother in about October 2010, there had been little to no interaction between defendant and A.

Mother acknowledged that, on the Monday before the alleged touching incident, A. had admitted to mother that she had lied. Mother conceded that she had not personally heard A. lying. Defendant had sent a text from the living room of Barbara Smith's house to mother, who was in another room.[2] His text stated, "[Y]our daughter told me that [J.'s] not my son, why would she say that[?]" Mother then talked to A. about lying. Mother had angrily questioned A. about the supposed lie "over and over again." Mother had also allowed Barbara, a stern adult with whom A. was unfamiliar, to question A. Barbara had lectured A. on how terrible it is to lie, especially about something so serious. A. finally admitted she had lied.

At trial, mother acknowledged that defendant and mother had discussed whether or not defendant was J.'s father in A.'s presence and there had been a suggestion that defendant was not J.'s father. Defendant had asked mother "plenty of times" whether or not J. was his son.

On the day of the alleged touching, a Thursday, J. had fallen into the side of a dresser and was bleeding profusely from his gums. Mother had been told by responding

---

[2] We will refer to Barbara Smith by her first name since defendant and she share a surname.

6

ambulance personnel that J. needed stitches but she had turned down the ambulance service because she did not want to pay for it. At around noontime, mother left with J. to go to urgent care and they did not return home until 6:00 or 7:00 p.m.; they used public transportation. This was the first time that defendant had been alone with A.

While they were at the doctor's appointment, mother received a text message from defendant asking, "Who is Jacob?" Mother sent a reply text, "My ex-boyfriend's cousin." She surmised that defendant thought she was cheating on him or talking to another guy.

When mother came home, A. rushed out of her room and hugged and clung to mother. Defendant was sitting on the couch. Defendant told mother that "he gave [A.] a time out because she was in the bathroom too long . . . and she cried herself to sleep."

On Friday evening, A.'s paternal grandparents picked up A. for a weekend visit. Before the grandparents arrived, defendant was discouraging mother from sending A. to the grandparents for the weekend. At that time, defendant said nothing about what had occurred while mother had been absent the previous day.

Within an hour after A. had left with her grandparents that Friday, defendant disclosed to mother, for the first time, what had supposedly happened during mother's absence on the previous day. He said that A. had "told him that someone was hiding in her closet in the nighttime and would kiss on her before she wakes up." Defendant also said that A. "had climbed on top of him and tried to kiss him" and he had pushed her off. He reported that A. told him that "she had been touched by a man named Jacob," who "hid in her closet in the nighttime" and kissed her and left before mother woke. Defendant further disclosed that A. had indicated "she would rather go down on my son, [J.], than him" because J. was small. Defendant was drunk at the time and he seemed angry. His account was "very scrambled." When defendant mentioned this Jacob, mother had no idea who that was. Mother recalled that she "looked at him weird[ly]

7

because [her] daughter doesn't use the phrase 'going down.' " Defendant seemed unconcerned about his son's health and welfare.

At trial, mother testified that A. had twice come in contact with someone named Jacob, a cousin of mother's ex-boyfriend, while mother and A. were at the house of mother's ex-boyfriend. A. had never been alone with that adult Jacob; mother had been around. Mother also had a one-year-old nephew named Jacob. No one named Jacob had ever visited her apartment; no adult named Jacob had ever been there.

After defendant's disclosures, mother wanted to contact or pick up A. but defendant told her not to. Mother was feeling very upset and confused; she was wondering why defendant had not told her right away. Defendant's explanation for waiting until Friday night to tell her was that he had a headache or was sleepy on Thursday night. He also explained to her that A. had made him pinky swear that he would not tell mother what A. had said. Mother had never heard A. use the phrase "pinky swear" but indicated that "pinky swearing" was a "thing that [defendant] does, that [he'd] done to [her] in the past . . . ." Defendant told mother not to call A. He did not suggest contacting the police.

Mother testified that defendant pushed her to find the adult Jacob whom she knew and confront him. They drove to the location where mother thought Jacob lived but they did not find him.

Over the weekend, defendant and mother did not discuss what A. had told him or J.'s welfare.

A. normally spends every weekend with her paternal family. Ordinarily, after the weekend visit, the paternal grandparents bring A. to school on Monday and mother picks up A. after school on Monday. The next time mother spoke with or saw A. was when she picked up A. from school on the Monday following the alleged touching.

While they walked home from school together, mother told A. what defendant had said and questioned her about "a guy named Jacob" hiding in her closet and kissing her.

8

A. looked confused and appeared to not understand. A. indicated that the person doing those things was defendant. A. indicated defendant had kissed her and eventually disclosed that defendant had put his tongue in her mouth and in her "private." At this time, when A. was five years old, she used the words "private stuff" or "private area" to refer to her vagina.

Mother telephoned defendant, informed him of A.'s reaction, and told him that "the stories weren't matching up." Defendant said he was at work and could not talk. He wanted to talk about it with mother and A. at the apartment.

Mother asked A. again, "Who was it who touched you," and A. said that defendant did. Mother called 911 from a gas station and told the operator that her daughter had said that defendant had kissed her and touched her. At that time, she wanted the police to intervene and arrest defendant.

Mother thought what had happened was her fault and A. would get taken away from her. Officer Kopp, the responding police officer, met mother and the children at the gas station. Mother told the officer that A. had said she had been touched on the outside of her clothing and kissed on the lips. Mother did not tell the officer that defendant had put his tongue on or kissed A.'s "private area" or vagina.

Mother later testified that, at the behest of officers, she made two pretext calls, which were recorded, to defendant. Defendant was subsequently arrested.

That evening, subsequent to defendant's arrest, mother accepted about 12 telephone calls, which each cut off after about 15 minutes, from defendant who was in jail. They were recorded. Some of the conversations involved A.; at times, mother handed the cell phone to A. so A. could speak directly to defendant.

During the jail calls, mother questioned A. repeatedly and at length, sometimes prompted by defendant; she accused A. of lying over and over again. Mother admitted to feeling angry at A., being very emotional and upset, and having mixed emotions. Although A. repeatedly identified defendant as the perpetrator, at points on the recording

9

of the jail calls, A. gave an equivocal or unintelligible answer with respect to whether defendant had touched her or whether she was lying. At some point, A. admitted to lying. At another point, A. said it was Jacob, not defendant, who had touched her.

When mother accepted the first call, she wanted to hear defendant's side of the story; she was hoping for an apology. He told mother that she should have talked to him before calling 911. Defendant told mother that A. was lying, he was concerned for A., and he was trying to help mother. Mother was torn and she did not know what to think.

With an angry tone of voice, mother called A. over to her. Mother asked defendant what he wanted her to ask A. Defendant said that A. would just say "the same thing" and referred to the time A. had lied about J. not being his son. Defendant asked mother to come to the jail and get him out and they could go from there.

During the second call, mother warned defendant that the telephone calls were being recorded. He continued to ask mother to come and get him out. Defendant indicated that the whole thing was a lie and he had not done anything to A. He suggested that mother tell the authorities that she had called because she had been "pissed off" and she had used her "instincts" about what had occurred. Mother asked defendant, "Why would I want to help you, even though I believe my daughter?" They talked about that and defendant said, "Why wouldn't you because you love me, because we're trying to work on things[,] because we have a kid together and I really need to be there for him?" Defendant indicated that he had discussed what happened between A. and him because of his concern for A. and, if he had not been concerned, he would have said nothing.

Mother, who was angry, told A. to get up and talk to defendant and she put A. on the telephone. A. started to cry and did not want to get on the telephone; mother ordered her to talk to and answer defendant. Defendant asked A. why she lied. A. twice told defendant, "I told my momma what we did." Defendant again asked A. why she lied to her mom. He asked A. what she told mother. Mother instructed A. to tell defendant what

10

A. had told mother. A. said she did not remember. With an angry tone, mother asked, "What do you mean you don't remember?" A. said again that she did not remember.

Mother accused A. of lying. Defendant and mother continued to ask A. why she was lying. Mother asked A. what she had told defendant. A. responded, "I told him to stop." When mother said, "What did he do," A. replied, "He put on my private stuff." Mother asked A. to say it again and defendant said, "Tell me." A. said, "You put your tongue in my private stuff." Defendant asked A. why she was lying. A. said, "I'm not. You did it." A. indicated that defendant also put his tongue on her throat. Defendant then accused mother of telling A. what to say.

During the next call, mother stated to defendant, "She won't change her story." At trial, mother testified that she wanted A. to change her story because she did not want to believe defendant had done those things. She indicated that defendant was the father of her son and she was thinking of her son. She had wanted to prove that A. had lied and asked defendant during the call, "Is there any way they can do a test to prove that she lied?" Mother said, "Damn, I believe her, but I want to get your ass out."

Mother began repeatedly asking A. about whether and why she had lied. She indicated that A. would not get in trouble if she had lied but admitted it. A. would get candy. A. apparently acknowledged lying. Mother told A. that defendant was in jail and asked if A. understood how serious that was. When mother asked who really did that to you, A. said, "He did." Mother asked, "Who am I supposed to believe[?]" A. initially said, "Him," but, when mother asked again, A. said, "Me." Mother was upset and angry and she continued to question A.

Mother promised candy or whatever A. wanted if she told the truth. When mother asked for the truth, A. indicated defendant did it. When mother asked again, A. said that defendant just watched her. When she asked again, A. indicated defendant did it. A. indicated nobody else had done anything. Defendant asked why A. had told him that Jacob did it and mother began to put that question to A. A. said, "I didn't." At

11

defendant's prompting, mother asked A., "Where is Jacob hiding at?" A. answered, "Nowhere." Mother asked A. whether Jacob was a little fly and A. said yes. When mother asked again, "Where is Jacob hiding at [?]," A. said Jacob was outside and hiding.

At some point, A. indicated she was scared. Mother told A. that "she better be scared if she lied" and told A. to look at her. Mother asked A. whether defendant "did it or did he not." A. told mother that "he did." Mother asked A. why did she say she had lied. Mother kept asking questions because she did not want to accept what was happening. At one point, mother asked whether defendant touched A.'s private stuff on accident. A. said no. Mother repeatedly asked whether A. was lying and received inconsistent answers. Mother wanted A. to say she was lying. Mother asked A. multiple times whether someone else had done it to her. A. indicated only defendant had done something. Mother asked A., "Why did you lie," and "Why do you lie?" Both times A. answered, "I didn't." Defendant directly questioned A.

The fourth call took place about an hour after mother received the first call. During the fourth phone call, mother and defendant had a conversation about Lynnece; mother was concerned defendant was having a relationship with her. Mother was still hoping to have a relationship with defendant and she wanted to help defendant. Mother started to question A. again, asking A. whether she was lying. A. said no and mother asked, "Why do you keep saying no?" Mother continued to interrogate A. in a stern voice. She did not accept A.'s assertions that defendant had done it and A. was not lying. At defendant's prompting, mother asked A. if she remember saying J. was not defendant's son and again asked whether A. was "lying about this whole situation." A. said no. Mother told A. she would be in trouble if she were lying and offered to give A. a cookie or whatever she wanted, if A. told the truth. A. said, "I did tell the truth." Mother asked where did it happen and A. said in mother's bed. Mother continued questioning. At some point, A. started crying and said she was scared. Mother asked A. whether she wanted to get defendant in trouble and A. answered no.

12

Mother told A. she wanted A. to tell her the truth and A. said, "I don't remember." She angrily accused A. of lying about defendant kissing her, "him going down there," and "all of it." A. said no. At some point, after A. denied that Jacob did it, mother asked why A. told defendant that. A. said, "Jacob's a fly." At defendant's prompting, mother asked about Jacob hiding in A.'s closet. When mother asked A. why she told defendant that, A. replied, "I didn't." Defendant said, "Yes, you did. That's why I told your mom." Mother continued to tell A. to stop lying and questioned her further. After A. said defendant had kissed her on the lips, mother threatened to tell Barbara that A. was lying. At defendant's prompting, mother asked A. whether she had kissed defendant. Mother asked, "I mean you kissed him and he pushed you off him, right?" Mother repeatedly tried to confirm nothing else happened. A. told mother she had made up a story. Mother become upset and told A. that defendant was in jail because of her.

During the fifth telephone call, mother told defendant that A. did not know what a "pinky swear" was. When they talked about defendant's claim that A. had said something about "going down," mother said, "That doesn't seem like what any 5 year old says." At trial, mother testified that she had not heard her daughter ever use the phrase "going down" or ever make any sexual statements. After mother pressed A. several times during the call to say that Jacob did it and A.'s responses were inaudible or unintelligible, mother twice asked, "Why did you say it was Jermaine?" A. answered both times, " 'Cause I didn't remember." Mother continued her questions. At some point, mother asked, "Who's Jacob?" A. told mother that "she just made a name up." At another point, mother asked, "Who really touched you." A. said that defendant had touched her. Mother asked A. to not lie anymore and to tell her who really did it and A. said, "Jermaine." Mother stated, "I know I said I wanted to know who really did it." A. said "Jermaine." Mother responded, "Why do you keep saying Jermaine[?] That's not who did it. You know who it is[,] so who did it[?]" This time A. replied, "I don't know."

13

Later in that conversation, after mother told A. she was lying, A. asked, "What should I do." Mother, who was still angry, said, "Stop lying and tell me the truth." A., who had watery eyes, said that she did tell the truth. Mother threatened to call Barbara if A. was lying and warned A. that Barbara would be "really mad." A. said, "Mommy, please don't." Shortly thereafter, mother sent A. to bed.

During the sixth call, mother indicated that defendant and she could not be together so long as A. was saying defendant did it because A. had a big mouth. For the remainder of their conversations, mother was trying to help defendant. While still on the telephone with defendant, mother decided to take A. to Eric and Barbara so they could question her.

On Tuesday morning, Detective Scott called mother to set up an interview of A. but mother did not agree to let him interview A. Mother brought A. to Eric's and Barbara's home to allow them to question A.

On October 13, 2010, when mother spoke with Detective Scott at the child interview center, she conveyed her conversation with A. that had taken place on the way home from A.'s school. Mother related that A. said defendant put his mouth on her "private stuff." The transcript of that interview refreshed mother's memory at trial that A. had been the one to first mention defendant's tongue and A. had told mother that defendant put his tongue in her "private area."

Mother acknowledged that child protective services (CPS) had contacted her in connection with A.'s allegations. Mother had been told that A. would not be taken from her because she was pursuing the case against defendant.

Annette Ermshar, a clinical psychologist, testified on behalf of the defense as an expert in the areas of clinical and forensic psychology, CSAAS, and childhood memory and suggestibility. Dr. Ermshar testified that CSAAS had no scientific underpinnings and was of no value as a forensic tool. There was no scientific profile of children who had been sexually abused. She acknowledged the CSAAS testimony had not been offered as

14

a diagnostic tool. She also acknowledged the CSAAS information was intended to dispel myths and skepticism regarding children who have been sexually abused and, she conceded that, under California law, juries may consider it.

Dr. Ermshar testified that the brain is not fully developed until the late teens or early 20's. A five-year-old's memories are "highly subject to distortions, to changes, to fantasy, to imagination and that's just the nature of childhood." "[C]hildren under the age of 6 [years are] most prone to distortions of memory." There is "anecdotal evidence that children are absolutely capable of creating a whole story in their head [*sic*] without any suggestion from others." Dr. Ermshar thought it was possible that a lie told by a five-year-old could, over time, transform into what the child believes to be an actual, reliable memory. She believed that most five-year-olds do not intend to lie but "their idea of truth is distorted and they don't realize it." Research suggests that five-year-olds have "a difficult time . . . encoding and retrieving information . . . in a fully reliable fashion."

Dr. Ermshar concurred that a parental reaction to a childhood incident may affect how the incident is later recalled. A child's certainty in retelling an event does not mean that the memory is genuine.

Dr. Ermshar agreed that viewing a sexual act at a young age could contribute to the creation of a false memory. She explained that the mixing in of new information with old information contributes to false memories. She thought it was possible that, in a child's memory of sexual abuse, someone else might be substituted for the actual perpetrator and the child would regard the conflated memory as genuine. There was research indicating that, generally speaking, children's reports of being touched are unreliable. Research suggested that the most accurate memories are those reported immediately after the event. Memories become more unreliable with the passage of time.

According to Dr. Emshar, children are highly susceptible to suggestive statements and the demeanor and style of the adult questioners impacts the children's responses.

15

Long interviews with repeated questioning leads a child to believe that he or she did not previously answer the question correctly and he or she must change the answer to satisfy the interviewer. When questioning children about potential abuse, very open-ended, "[n]onleading questions" are a better method for eliciting accurate information than "direct leading questions or close-ended questions."

Lynnece Jones had been in a romantic relationship with defendant for less than two years and it ended about August 2010. Jones had a daughter who was born in December 2007. Defendant had lived with Jones and her daughter for a good portion of their relationship. Jones thought of defendant as the father figure in her daughter's life. Defendant had watched and cared for Jones's daughter when Jones went to school from around October 2009 to December 2009. Defendant had not done anything to give Jones the impression that he had mistreated her daughter in any way.

Eric Smith,[3] who was about 38 years old, was defendant's second cousin and they grew up together and were "very close." They had spent a lot of time together over the 10 years before trial; defendant frequently visited his home. Eric had a 20-year-old stepdaughter and a 12-year-old daughter and defendant had spent a lot of time with both of them. Defendant had babysat Eric's daughters as many as three or four times when Eric and his wife had gone to the store or out of the house. Eric had never observed defendant engage in any sexually inappropriate behavior with his daughters or been given any indication that defendant acted inappropriately while he was gone.

During October 2010, mother, A., and defendant were at Eric's house. Eric heard A. say that defendant was not J.'s father. Defendant went to speak with mother who was in the back of the house with Eric's wife, Barbara. Mother spoke to A. and then Barbara

---

[3]     We will refer to Eric Smith by his first name since defendant and he share a surname.

16

spoke to A. Barbara then told defendant, in the presence of mother, that defendant "need[ed] to be careful because that little girl will end up getting him in trouble."

About a week later, after defendant's arrest, mother called Eric; she was hysterical and said something about putting defendant in jail. Eric met mother and A. at his home. Eric took A. out on the balcony to get her away from mother and his wife and, according to Eric, he spoke very calmly to A. When Eric asked whether or not defendant had actually touched her, A. said, "Down there." But, at another point, A. had indicated that defendant had not touched her. According to Eric, A. had said at some point that she wanted to get defendant in trouble. A. did not say Jacob touched her.

Defendant testified in his own behalf. He had been convicted of a number of felonies. His felony convictions included a 2010 conviction of receiving stolen property, a 2008 conviction of possession for sale of marijuana (Health & Saf. Code, § 11359), a 2006 conviction of grand theft, and a 2003 conviction of false impersonation (§ 529). He also had two petty theft convictions and two misdemeanor convictions of giving false identification to a peace officer.

When asked how he had come to be living with mother, defendant explained that he had been living with his grandmother and he did not want to be around everybody there. He was in the process of getting "Section 8" housing, which he had lost because of his incarceration. He was not planning on staying with mother. He admitted that he was seeing or dating three other women, including Lynnece. By moving into mother's apartment, defendant led mother to believe he was at least open to the possibility of reestablishing a romantic relationship with her. He claimed that one of his reasons for going to live with mother was to help out with his son.

Defendant acknowledged there was a question in his mind about whether or not he was J.'s father. He and mother had discussions about it.

Defendant testified that he had lived with mother for about a week or two when A. was left alone with him. Defendant initially testified that he told mother no when she

17

asked him whether he felt like watching A. but he later denied that he had told mother no when asked to watch A. In later testimony, defendant insisted that he had not agreed to watch A. He conceded that he told Officer Shipkey after his arrest that he had said yes when mother asked him to watch A.

According to defendant, A. was in her bedroom when mother left. Defendant slept on the couch in the living room. A. woke him up several times. A. climbed on top of his chest and was sitting on him as he was lying on his back on the couch. According to defendant, she kissed him with an open mouth and he pushed her off and she hit the floor. Defendant told her that "she can't be doing that." A. had never before kissed him or been affectionate with him. Defendant testified that, when A. kissed him with an open mouth, defendant thought that conduct was "totally inappropriate" and "someone was molesting her."

Defendant testified that he asked A. "who showed her how to do that." According to defendant, A. responded that a guy named Jacob lets her climb on top of him and sit on him and Jacob "kisses her and touches her and then he comes inside the closet when [mother] and her boyfriend were sleeping and he leaves in the morning." He testified that A. said that Jacob "tries to tell her to go down on him, but she wouldn't do it." According to defendant, A. said "she would do it to [his son J.] because his was smaller." Defendant understood the phrase "go down" to refer to the sexual act of oral copulation and he understood A. was talking about molestation. Defendant claimed that, when he stated he was going to tell mother, A. made him "pinky swear" that he would not tell mother.

Defendant sent a text to mother, "Who is Jacob[?]" Mother responded, "My ex-boyfriend's cousin." Defendant did not call mother at that point to tell her what had happened because he was tired.

Defendant testified that he went back to sleep on the couch and he had stayed on the couch the entire time he was alone with A.

18

Defendant recalled receiving a number of telephone calls from mother while she was gone, including one call after the text exchange about Jacob. Defendant did not inform mother what had happened while he was alone with A. during the telephone call or after she returned home that evening. He did not recall telling mother after she came home that A. had been on a time-out.

The next morning, defendant left for work at about 6:00 a.m. but he did not make any attempt to call from his cell phone while he was at work to tell mother what had happened with A. the previous day. According to defendant, when he returned to the apartment on Friday evening and learned that A. was going to her paternal grandparents' home, he told mother to not send A. At trial, he initially testified that he did not want A. to go there because he did not know if "there was a Jacob over there." He later testified that the reason was that he wanted to talk to them both. He asserted that the concern about A. being around Jacob had "never crossed [his] mind."

Defendant recalled telling mother, after A. had left with her grandparents, that A. had told him that "some guy named Jacob had been touching and kissing on her . . . ." According to defendant, mother wanted to go find Jacob. Defendant did not think about calling the police. They went to the place where mother believed Jacob was staying but they did not find him and returned to mother's apartment. Defendant denied telling mother not to call A. and asserted mother never suggested it.

Defendant stated that, when they returned from grocery shopping on the Saturday following the alleged incident, they discovered the apartment's back door was open, the screen to the window in the children's bedroom was off, and the window was partially open. A. had told him that she always locks up and she never opens that window. The police were not called.

Defendant acknowledged that, on the following Monday, he received a telephone call from mother in which she said that his story and A.'s account did not make any

19

sense. A. was saying that it was defendant who touched her. He told mother that he was at work and he would talk to her later.

Defendant was arrested after returning to the apartment following work.

At trial, defendant maintained that he had never inappropriately touched A. and he had not committed any crime. He reiterated that A. told him that Jacob sneaks in at night, hides in the closet, and comes out and touches her. He maintained that he had no relationship with A., they did not talk to each other, and he merely saw her in the same home. He claimed he had never left the couch while he was alone with A.

On October 11, 2010, after his arrest and before speaking to mother from jail, defendant was interviewed by Officer Shipkey. At that point, defendant did not know what had been reported to the police. The interview was recorded.

At trial, defendant indicated that he had not told the truth when he informed Officer Shipkey that Barbara had warned him to be careful around A. "before she goes back and tells somebody . . . that you're touching on her." He indicated that Barbara had told him to be careful. He conceded that he had told the officer that he was tired and he did not go to work at all on the day he was alone with A. Defendant told the officer that he had been lying in bed and A. had not sat on him. He never mentioned to Officer Shipkey that he had been on the couch. Defendant did not tell the officer that A. had gestured to her "private area" in response to his questioning about Jacob. He acknowledged that, when Officer Shipkey asked whether A. said "something like I do that to Jacob, try to go down on him," he answered no. Defendant acknowledged telling the officer, "She didn't say go down. She just said, [']I touched [J.]['] " Defendant also admitted he incorrectly told the officer that he had spoken to mother on Thursday night about what A. had supposedly told him.

When asked about the purpose of the jail calls to mother, defendant testified that "personally . . . it didn't even dawn on me to change her mind" and the calls were "just to let her know that I didn't do it." He acknowledged telling mother that "something she

20

could do for [him] was [to] not show up in court." He conceded that he had asked mother to come to the jail the next day and tell them that she had lied. After mother indicated that the phrase "going down" did not sound like anything a five-year-old would say, defendant stated, "It was into my ears. It was just that . . . fucked up because, obviously, somebody's really doing that to her." At trial, defendant indicated that he had believed that someone was orally copulating A.

On October 14, 2010, subsequent to the jail calls, defendant was interviewed by Detective Scott. The interview was recorded. Defendant told Detective Scott that he had been sick and tired and he had gone home after half a day's work on the day of the alleged incident. For the first time, defendant told a law enforcement officer that, while alone with A., he had been on the living room couch all day. He told the detective that his "aunty" had warned him with reference to A. to "[b]e careful before the little girl go back saying something that you ain't doing."

Defendant also told Detective Scott that he had asked A., "Who taught you to kiss like that[?]" He indicated that her answer was Jacob. He reported that he had asked A., "What did Jacob do to you," and A. had touched her "private area" to show him what Jacob had done to her. Defendant said that A. had told him that "[s]he goes down on him and she don't like to do it, but she would do it to my son." He also reported that A. had said that "she goes down on him, but . . . she doesn't like to because it's too big and she does it to my son." Defendant did not tell the detective that A. had asked him to "pinky swear."

Defendant further told Detective Scott that he had been in mother's apartment "not even a week" and, at one point, defendant said he had been around A. only two times and, at another point, he said he had been around A. for only a day. He said he had not talked to A. The detective indicated that DNA evidence had been found and talked to defendant about the allegation that his tongue had been on A.'s vaginal area.

21

Several weeks after he was incarcerated, defendant wrote a letter to mother in which he described what had supposedly happened while he had been alone with A. Defendant wrote that A. kissed him and he awoke to find her on top of his face and he threw her to the floor. When defendant had asked A. "who had been doing something like that to her," A. had made the disclosures about Jacob. He wrote, "God as my witness I love you and didn't know how to tell you that your little girl has been involved in sexual activities." He indicated more than once that he never left the couch. He stated in the letter, "I didn't do anything besides not tell you in the beginning because I was embarrassed that it happened to me only after being warned." Defendant asked for her help. He wrote, "Please don't talk to any more cops" and "Do not testify against me." Defendant asked mother to work with him for their "son's sake now that [he] told [her] the truth." He wrote, "Please tell me [that] you will help me." He told mother he loved her and again asked for her help. He wrote, "I can honestly say I love you more than ever. I would not hurt you or our son or our daughter." He told mother that he wanted to take her to city hall on his birthday and marry her. He wrote, "I only want to be a family."

C. *Prosecution's Rebuttal Case*

Barbara Bonds, also known as Barbara Smith, testified that she was Eric's wife. At the time of trial in 2013, she had known defendant for about 12 or 13 years. On an evening in October 2010, defendant, his girlfriend, and her children visited Barbara's home. At some point, Barbara learned that A. had said that defendant was not J.'s father. Barbara asked A. whether she had said that and A. acknowledged making the statement. Barbara asked A. why she would say that and whether anyone had told her to say that. Barbara told A. that was not a good thing to say to someone and instructed A. to tell defendant that she was sorry. Barbara shared with defendant her concerns about A. lying about him and the possibility of something else coming up.

22

Barbara was interviewed by Detective Scott on October 22, 2010 and the interview was recorded. She recalled telling defendant, after A. had lied, to not be surprised if something else not true comes up. She did not recall telling the detective that she had warned defendant to never be alone with that little girl because "you never know what's going to happen." She recalled explaining that her reason for warning defendant was that, if the girl had lied, anything could happen. Barbara could not recall telling the detective that she had warned defendant, "Jermaine, don't be surprised if this little girl ever says that you touched her or anything." Barbara did recall Detective Scott asking how she had made such a leap from A.'s statement about defendant not being J.'s father. She responded that "it just came to mind." Barbara did remember telling the detective that she told her husband after mother called police, "I told you so." Barbara told the detective that she had warned defendant to be careful because "you never know what else she might say."

After defendant's arrest, A. and mother returned to Barbara's home. Mother was crying. Barbara questioned A. She used a doll to talk to A. This was her second contact with A.

II

*Discussion*

A. *Evidentiary Rulings*

1. *Evidence of A.'s Prior Conduct with Men*

a. *Background*

Prior to trial, defense counsel brought a motion to admit evidence of A.'s prior conduct pursuant to Evidence Code section 782. The motion stated that "[a] review of the accompanying affidavit demonstrates the clear relevance of the evidence to [defendant's] defense." The appellate record does not include that affidavit.

At the hearing on the motion, the court described the proffered evidence as A's prior conduct of hanging on the necks of adult males and sitting in their laps. Defense

23

counsel argued that A.'s inappropriate, sexualized conduct with men was circumstantial evidence of a prior molestation by someone other than defendant. He argued that the proffered evidence went to A.'s veracity. Defense counsel suggested that the evidence was also relevant to defendant's credibility. Defense counsel pointed out that defendant told the police that, while he was asleep on the couch, A. crawled on top of him and she started kissing him with an open mouth.

The court found that the proffered evidence was of "equivocal activity," not "prior molestation." The court ruled that Evidence Code section 782 keeps it out.

Evidence Code section 782 sets forth the procedure for determining the admissibility of "evidence of sexual conduct of the complaining witness . . . to attack the credibility of the complaining witness." The procedure applies to a prosecution under section 288 or 288a. (Evid. Code, § 782, subd. (c).) The section "applies when the defense seeks to introduce relevant evidence of prior sexual conduct by a child. [Citation.]" (*People v. Mestas* (2013) 217 Cal.App.4th 1509, 1514-1515.)

"First, the defendant must file a written motion and an offer of proof detailing the relevancy of the evidence. ([Evid. Code], § 782, subd. (a) (1), (2).) If the court finds the offer sufficient, it shall order a hearing out of the presence of the jury to allow questioning of the complaining witness regarding the offer of proof. (*Id.*, § 782, subd. (a)(3).) If the court finds the evidence relevant under [Evid. Code] section 780 and admissible under [Evid. Code] section 352, the court may make an order stating what evidence may be introduced by the defendant and what questions are permitted. (*Id.*, § 782, subd. (a)(4).)" (*People v. Fontana* (2010) 49 Cal.4th 351, 354.)

On appeal, defendant makes it clear that he is *not* challenging the court's pretrial ruling under Evidence Code section 782. Insofar as defendant may be arguing the court's pretrial ruling violated due process, he has forfeited the contention by neither raising a "due process" theory of admissibility below nor successfully challenging the evidentiary ruling on appeal and arguing the error had the additional legal consequence of violating

24

due process.  (See Evid. Code, § 354[4]; see also *People v. Gordon* (1990) 50 Cal.3d 1223, 1264-1265, disapproved on another ground in *People v. Edwards* (1991) 54 Cal.3d 787, 835; cf. *People v. Partida* (2005) 37 Cal.4th 428, 436, 438-439.)

b.  *Relevance and Admissibility*

Instead, defendant is arguing on appeal that A.'s prior conduct with men was "not sexual and fell outside the strict requirements of [Evidence Code] section 782."  He now asserts that the trial court abused its discretion by excluding evidence that A. had been seen hanging onto the necks of adult males and sitting on their laps.  He insists that the evidence "corroborated [his] claim that he awoke to find her on top of him" and the admissibility of the evidence should have been considered under the "standard principles of relevancy."  Defendant argues that the trial court's exclusion of evidence of A's prior conduct violated his constitutional right to present a defense.

At trial, defendant did not seek the admission of the prior conduct evidence, and the trial court did not rule, on the theory of relevancy and admissibility now espoused. Consequently, defendant forfeited any claim on appeal that the exclusion of that evidence impaired his constitutional right to present his defense.  (See Evid. Code, § 354.)

Moreover, "due process considerations hold sway over state evidentiary rules only when the exclusion of evidence 'undermine[s] fundamental elements of the defendant's defense.' [Citation.]"  (*Fry v. Pliler* (2007) 551 U.S. 112, 124; cf. *People v. Partida*, *supra*, 37 Cal.4th at p. 436 ["the admission of evidence, even if error under state law,

---

[4]     A judgment will not "be reversed[] by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice and it appears of record that: [¶] (a) The substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means; [¶] (b) The rulings of the court made compliance with subdivision (a) futile; or [¶] (c) The evidence was sought by questions asked during cross-examination or recross-examination."  (Evid. Code, § 354.)

violates due process only if it makes the trial fundamentally unfair"].)  In this case, A. admitted to Officer Kopp, during an interview on October 11, 2010, that she "got on top of" defendant while he was sleeping and that evidence was admitted at trial.  Defendant has not shown that the trial court infringed upon his constitutional right to present a defense and, thereby, violated his right to due process.  (See *People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103.)

c.  *Related Claim of Ineffective Assistance of Counsel*

Defendant alternatively argues that his trial counsel rendered ineffective assistance by (1) seeking to admit evidence of A.'s prior behavior with men pursuant to Evidence Code section 782 and (2) failing to seek to admit the evidence on the ground it corroborated his version of events.

In *People v. Daggett* (1990) 225 Cal.App.3d 751, which is cited by defendant, an appellate court stated:  "A child's testimony in a molestation case involving oral copulation and sodomy can be given an aura of veracity by his accurate description of the acts.  This is because knowledge of such acts may be unexpected in a child who had not been subjected to them.  In such a case it is relevant for the defendant to show that the complaining witness had been subjected to similar acts by others in order to cast doubt upon the conclusion that the child must have learned of these acts through the defendant. Thus, if the acts involved in the prior molestation are similar to the acts of which the defendant stands accused, evidence of the prior molestation is relevant to the credibility of the complaining witness and should be admitted."  (*Id.* at p. 757.)

Without reviewing the supporting affidavit, which is not part of the appellate record, we cannot conclude that the defense counsel's strategy of seeking to introduce the evidence of A.'s allegedly sexualized prior conduct with men pursuant to Evidence Code section 782 was unreasonable.  After the pretrial ruling, defense counsel could reasonably anticipate that the trial court, acting within its discretion, would sustain an objection to the evidence of A.'s prior conduct with men under Evidence Code section 352 even if

26

offered as non-sexual conduct relevant to defendant's credibility. The evidence had very little probative value, especially in light of A.'s out-of-court statements indicating she had climbed on top of defendant while he was sleeping. Those statements were admitted into evidence at trial.

Defendant has shown neither the deficient attorney performance nor the prejudice required to establish an ineffective assistance of counsel claim. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687-689, 694 [104 S.Ct. 2052]; *Harrington v. Richter* (2011) __ U.S. __, __ [131 S.Ct. 770, 791-792].)

2. *Defendant's Out-of-Court Statement to Mother about Being Tired*

a. *Procedural History*

During cross-examination of mother, defense counsel asked her: "Do you recall that Mr. Smith was tired on that day? Do you recall testifying before that he was falling asleep on the couch?" The mother replied, "I don't remember." Defense counsel then inquired, "Do you recall him telling you that he didn't really want to watch [A.], but that he would be happy to if she wanted to stay . . . ?" The prosecutor interposed a hearsay objection, which the court sustained. Mother nevertheless answered, "I don't remember that." The trial court struck that answer.

Later, out of the presence of the jury, defense counsel unsuccessfully argued that defendant's statements to mother were relevant to show that he had not sought to have contact or time alone with A., but rather he had discouraged mother from leaving A. with him, and the statements were not being offered for their truth.

Defense counsel subsequently asked mother, "Do you remember [defendant] telling you that he was tired but that she could stay if she wanted to?" The court sustained the prosecutor's hearsay objection.

b. *No Reversible Error*

Defendant now argues that the trial court erroneously excluded evidence that defendant told mother that he was tired when she asked him to babysit A. He maintains

27

that his "expressed disinterest in being alone with [A.] was relevant to show that he did not intend to molest her." He argues that the court's erroneous evidentiary ruling infringed upon his constitutional right to present a defense and requires reversal of his conviction.

Defendant's out-of-court statement was not hearsay when offered as only circumstantial evidence of his state of mind with respect to whether he wished to be alone with A. rather than to prove the truth of the statement that he was tired. (See Evid. Code, §§ 210, 1200; Sen. Com. on Judiciary com., 29B Pt.4 West's Ann. Evid. Code (1995 ed.) foll. § 1200, p. 4 [" 'Hearsay evidence' is defined in Section 1200 as 'evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.' Under this definition, . . . a statement that is offered for some purpose other than to prove the fact stated therein is not hearsay. [Citations.]"]; Assem. Com. on Judiciary com., 29B Pt.4 West's Ann. Evid. Code (1994 ed.) foll. § 1250, p. 281 ["Under the Evidence Code, no hearsay problem is involved if the declarant's statements are not being used to prove the truth of their contents but are being used as circumstantial evidence of the declarant's mental state."].) Even assuming the trial court's ruling sustaining the hearsay objection to defendant's statement to mother that he was tired was erroneous, the error was harmless.

Defendant's alleged out-of-court statements to mother before mother left A. in his care had little probative value since the evidence was uncontroverted that mother was taking J. to urgent care, she wanted to leave A. at home, and she had no alternative child care at that point. Given mother's earlier responses to related questions, it is not apparent that mother would have remembered defendant's supposed statement about being tired. Even if evidence of defendant's supposed statement had been elicited on cross-examination of mother and supported an inference that that defendant had not contrived to be alone with A., such evidence had no probative value with regard to whether defendant engaged in a purely opportunistic molestation. It is not reasonably

28

probable a result more favorable to defendant would have been reached had the court overruled the hearsay objection to that statement. (See *People v. Watson* (1956) 46 Cal.2d 818, 836.)

As to defendant's due process claim with regard to exclusion of that evidence, "the proposition that the Due Process Clause guarantees the right to introduce all relevant evidence is simply indefensible." (*Montana v. Egelhoff* (1996) 518 U.S. 37, 42 [116 S.Ct. 2013].) "[T]he holding of [*Chambers* v. *Mississippi* (1973) 410 U.S. 284 [93 S.Ct. 1038]] . . . is certainly not that a defendant is denied 'a fair opportunity to defend against the State's accusations' whenever 'critical evidence' favorable to him is excluded, but rather that erroneous evidentiary rulings can, in combination, rise to the level of a due process violation." (*Id.* at p. 53.) "Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. [The United States Supreme Court has] long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense." (*California v. Trombetta* (1984) 467 U.S. 479, 485 [104 S.Ct. 2528]; see *Crane v. Kentucky* (1986) 476 U.S. 683, 690-691 [106 S.Ct. 2142].)

Despite the hearsay ruling, there was ample evidence from which defendant could argue that he had no design to be alone with A. Any erroneous exclusion of defendant's statement about being tired did not impermissibly infringe on his right to present a defense. (See *People v. McNeal* (2009) 46 Cal.4th 1183, 1203; *People v. Fudge*, *supra*, 7 Cal.4th at pp. 1102-1103; see also *United States v. Scheffer* (1998) 523 U.S. 303, 315 [118 S.Ct. 1261] ["The exclusions of evidence that [the United States Supreme Court] declared unconstitutional in [*Rock v. Arkansas* (1987) 483 U.S. 44; *Chambers v. Mississippi*, *supra*, 410 U.S. 284, and *Washington v. Texas* (1967) 388 U.S. 14] significantly undermined fundamental elements of the defendant's defense"].) Moreover, even if we were to assume the full damaging potential of the supposed statement, we

29

would find any error to be harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824].)

3. *Question Regarding Pretext Calls*

a. *Procedural Background*

Mother was recalled as a witness by defendant. On redirect examination, defense counsel asked about two pretext calls made to defendant before his arrest. Apparently, during those calls, defendant told mother that "he didn't do it."

Mother testified that she remembered making two 20-minute telephone pretext calls to defendant. Defense counsel asked, "In that time, he never told you, Hey, I did this, but I want you to help me convince [A.] to tell you something different." The prosecutor successfully objected on hearsay grounds. Defense counsel then asked to be heard and there was an unreported sidebar discussion.

Subsequently, on the record, the court stated that the People had objected to the defense questions posed to mother regarding the content of the pretext telephone calls to defendant on the ground of hearsay. Defense counsel explained that he was offering the evidence for nonhearsay purposes, namely as evidence relevant to prove the subsequent state of mind of mother and to impeach her credibility because mother, at one point, had indicated that she was trying to protect defendant even though she believed A. Defense counsel further suggested that the excluded evidence was relevant to show that, during the subsequent calls from jail, mother actually believed defendant's denial of wrongdoing. Defense counsel conceded, however, that mother did not say that she believed defendant's denial of wrongdoing during a pretext call.

The trial court ruled that defendant's statements during the pretext telephone calls were inadmissible.

b. *Sustained Hearsay Objection to Evidence Defendant did not Make Statement*

On appeal, defendant makes clear that he is attacking the initial ruling sustaining a hearsay objection after mother was asked about defendant *not* making a certain statement

during the pretext calls and he is *not* challenging the trial court's subsequent ruling excluding any statement denying wrongdoing during those calls. Defendant argues the trial court "erred in disallowing him from asking [mother] if [defendant] asked her to get [A.] to change her story." He contends that "[s]ilence, or the fact that a statement was *not* made, . . . does not qualify as hearsay."

The phrasing of the defense's question indicates that defense was seeking to confirm that defendant had never made such statement, not to elicit a hearsay statement. " ' "Hearsay evidence" is evidence *of a statement that was made* other than by a witness while testifying at the hearing and that is offered to prove the truth of *the matter stated.*' (Evid. Code, § 1200, subd. (a), italics added.)" (*People v. Zamudio* (2008) 43 Cal.4th 327, 350.) Evidence Code section 225 provides: " 'Statement' means (a) oral or written verbal expression or (b) nonverbal conduct of a person intended by him as a substitute for oral or written verbal expression." Evidence that defendant did *not* make a statement to mother during the pretext calls does not fall within the proscription of the hearsay rule.

The People now contend that defense counsel's "question *did* potentially call for hearsay because defense counsel asked a yes or no question . . . ." We find this argument to be disingenuous since presumably the prosecutor knew the content of those pretext calls and was aware defendant had not made the particular statement.

In any case, even assuming that the trial court erred by sustaining the initial hearsay objection, we find no reversible error. On appeal, defendant reasons that jurors might have inferred from mother's testimony regarding the jail calls that he had solicited her help in convincing A. to change her story and he "put [her] up to" it. Defendant argues that evidence that he did not ask mother to help convince A. to change her story during the pretext calls, which he believed were private, was relevant because it "made it less likely that he was behind [mother's] confrontational approach to [A.] during the jail calls."

31

Evidence that defendant did not ask mother, during the pretext calls, to get A. to change her story to protect him is of negligible probative value, if any.  During the recorded jail calls, defendant continued to maintain his innocence, prompted mother to ask certain questions of A., directly questioned A. himself, and repeatedly indicated A. was lying.  He tried to get mother to retract her complaint to the authorities and suggested she should help him because of their relationship and son.  He was clearly attempting to influence mother and A. regardless whether defendant had expressly requested mother's help during the pretext calls.  Moreover, at trial, mother explained her thinking during those jail calls.

In addition, there was uncontroverted evidence that, several weeks after defendant was incarcerated, he wrote a letter to mother in which he asked her to not talk to the "cops," to not testify against him, to work with him for their son's sake, and to help him.  The jury was instructed that "[i]f the defendant tried to discourage someone from testifying against him, that conduct may show he was aware of his guilt."

There is no reasonable probability that defendant would have obtained a more favorable result had the trial court not sustained the hearsay objection to evidence that defendant had not asked mother, during the pretext calls, to help protect him by getting A. to change her story.  (See *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)  Even if erroneous, that hearsay ruling did not deny defendant's constitutional right to present a defense.  "[E]xcluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense.  [Citation.]"  (*People v. Fudge*, *supra*, 7 Cal.4th at p. 1103.)  Defendant received "a fair opportunity to defend against the State's accusations."  (*Chambers v. Mississippi*, *supra*, 410 U.S. at p. 294 [93 S.Ct. 1038].)

B. *Alleged Prosecutorial Misconduct*

a. *Background*

During closing argument, the prosecutor discussed the elements of a lewd and lascivious act upon a child under 14 years of age. The prosecutor argued, "[F]or example, if you folks found that he moved her shorts aside, but didn't orally copulate her, he could have committed the crime in count two but not in count one . . . ." Defense counsel interposed no objection.

b. *Claim Forfeited*

Defendant now maintains that the prosecutor misstated the law regarding what constitutes a lewd act within the meaning of section 288, subdivision (a), in violation of due process. While defendant acknowledges that there were a number of acts aside from oral copulation that the jury might have found to be lewd and lascivious, he claims that the moving aside of A.'s shorts was not one of them because, even assuming the jury believed he moved aside A.'s shorts, the act was merely "preparatory" and "not a lewd act in and of itself." He contends that since the jury found him not guilty of oral copulation and since the prosecutor used the act of moving A.'s shorts as an example of a possible lewd act, "it is reasonably probable that the jury erroneously based its verdict on this very act." Defendant asserts that the prosecutorial misconduct was "of constitutional dimensions."

"As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) Defendant has not established that any exception to this rule excuses his counsel's failure to object. (See *People v. Hill* (1998) 17 Cal.4th 800, 820-821.) Consequently, defendant's claim of prosecutorial misconduct amounting to a constitutional deprivation was forfeited.

33

c. *Related Claim of Ineffective Assistance of Counsel*

Defendant alternatively argues that defense counsel performed deficiently by failing to object to the prosecutor's misstatement of law, failing to correct the misstatement during his own closing argument, or failing to request a corrective instruction. Without analysis, he asserts prejudice.

To begin with, defendant has not established that the prosecutor misstated the law. Under section 288, subdivision (a), with an exception not here applicable, "any person who willfully and lewdly commits any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony." "[S]ection 288 is violated by 'any touching' of an underage child committed with the intent to sexually arouse either the defendant or the child." (*People v. Martinez* (1995) 11 Cal.4th 434, 442.) "[C]ourts have long indicated that section 288 prohibits *all* forms of sexually motivated contact with an underage child." (*Id.* at p. 444.) "Conviction under the statute has never depended upon contact with the bare skin or 'private parts' of the defendant or the victim. [Citations.] . . . [A] lewd or lascivious act can occur through the victim's clothing and can involve 'any part' of the victim's body. [Citations.]" (*Ibid.*)

Thus, an act of touching involving the moving aside of the clothing of a child under the age of 14 years may, if done with the requisite intent, constitute a lewd and lascivious act. "It is common knowledge that children are routinely cuddled, disrobed, stroked, examined, and groomed as part of a normal and healthy upbringing. On the other hand, any of these intimate acts may also be undertaken for the purpose of sexual arousal. Thus, depending upon the actor's motivation, innocent or sexual, such behavior may fall within or without the protective purposes of section 288." (*People v. Martinez*, *supra*, 11 Cal.4th at p. 450.) "[T]he only way to determine whether a particular touching

34

is permitted or prohibited is by reference to the actor's intent as inferred from all the circumstances." (*Ibid.*)

The prosecutor recognized the specific intent requirement in closing argument and she never suggested that the requirement should be disregarded. Defendant takes the prosecutor's statement regarding A.'s shorts out of context. The prosecutor merely indicated that the act of moving aside A.'s shorts could be a lewd and lascivious act.

"Although it is misconduct for the prosecutor to misstate the applicable law [citation] or the facts [citation]" (*People v. Boyette* (2002) 29 Cal.4th 381, 435), the prosecutor in this case did not misstate the law or the facts. Rather, she permissibly suggested an inference that might be drawn from the facts in evidence. "Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial. [Citation.] Whether the inferences the prosecutor draws are reasonable is for the jury to decide. [Citation.]" (*People v. Dennis* (1998) 17 Cal.4th 468, 522.)

Moreover, in light of the jury instructions and the prosecutor's full argument, there is no reasonable likelihood that the jury understood the prosecutor to be arguing that evidence of the act of moving the shorts was sufficient in itself to prove count two. "Absent some showing to the contrary, we presume the jury followed the court's instructions. [Citation.]" (*People v. Merriman* (2014) 60 Cal.4th 1, 48-49.)

Before closing argument, the court instructed: "For the crime charged in count two, the People must prove, not only that the defendant did the act charged, but he acted with a particular intent." The jury was told: "The crime charged in count two requires proof of a union or joint operation of act and wrongful intent. For you to find a person guilty of count two, that person must not only intentionally commit the prohibited act, but must do so with a specific intent." It was instructed: "To prove that the defendant is guilty of [count two], the People must prove that: [¶] (1) The defendant willfully touched any part of the body of [A.], either on bare skin or through the clothing; [¶] (2) The defendant committed the act with the intent of arousing, appealing to, or gratifying the

35

lust, passions, or sexual desires of himself or the child; and [¶] (3) The child was under the age of 14 years at the time of the act.  The touching need not be done in a sexual manner."

The court also told the jury:  "You must follow the law as I explain it to you, even if you disagree with it.  If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."  It also informed the jury that "[n]othing that the attorneys say is evidence."

Defendant has satisfied neither prong of an ineffective assistance of counsel claim. " 'To prevail on a claim of ineffective assistance of counsel, defendant "must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice." ' [Citation.]"  (*People v. Lucero* (2000) 23 Cal.4th 692, 728.)

## DISPOSITION

The judgment is affirmed.

_____

ELIA, Acting P. J.

WE CONCUR:


_____

BAMATTRE-MANOUKIAN, J.


_____

MIHARA, J.